UNITED STATES DISTRICT COURT                    FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                    :
CURTIS JOHNSON and MARGARET                         :
JOHNSON, d/b/a TRINSTAR ENTERPRISES,                :
individually and on behalf of all others similarly  :
situated,                                           :
                                                    :
                          Plaintiffs,               :        MEMORANDUM AND ORDER
                                                    :
             - against -                            :        04-CV-4935 (JG) (VVP)
                                                    :
FEDEX HOME DELIVERY and FEDEX                       :
GROUND PACKAGE SYSTEM, INC.,                        :
                                                    :
                          Defendants.               :
----------------------------------------------------------------x

A P P E A R A N C E S :

          LAW OFFICE OF R. TANENBAUM
                    224 Franklin Avenue, #B4
                    Hewlett, New York 11557
          By:     Richard Tanenbaum

                    *Attorneys for Plaintiffs*

          O'MELVENY & MYERS LLP
                    1625 Eye Street, NW
                    Washington, District of Columbia 20006
          By:     K. Lee Blalack, II

          JENNIFER M. EVANS
                    Times Square Tower
                    7 Times Square
                    New York, New York 10036

                    *Attorneys for Defendants*


JOHN GLEESON, United States District Judge:

          In this action, plaintiffs Curtis Johnson and Margaret Johnson assert various

claims against FedEx Home Delivery and FedEx Ground Package System, Inc. (collectively

"FedEx"), including claims of racial discrimination in FedEx's employment of drivers, in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and

the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL").  After

a lengthy period of multidistrict proceedings, FedEx has moved for partial summary judgment on

the Johnsons' racial discrimination claims, arguing that the Johnsons are independent contractors

rather than employees as a matter of law.  For the reasons below, the motion is granted.

## BACKGROUND

A.    *Factual Background*

FedEx[1] provides nationwide pick-up and delivery services of small packages from

and to its customers' homes and places of business.  To provide these services, FedEx contracts

with numerous individuals to cover deliveries in one or more of FedEx's delivery routes, or

"work areas."

In May 2001, Curtis formed Trin Star Enterprises ("Trin Star") and purchased a

van with the intention of running a delivery business.  FedEx 56.1 Stmt. ¶¶ 16(d)–(f), ECF No.

32-2.  He registered Trin Star with the State of New York and applied for and received an

Employer Identification Number from the Internal Revenue Service.  *Id.* ¶¶ 16(e), 21.  Because

Curtis did not have a driver's license and Margaret already had a full-time job, the Johnsons

intended to hire other individuals to drive the van and perform deliveries.  *Id.* ¶¶ 16(j), 17(a).

Trin Star had sought delivery work made at least one delivery for hire before it entered into any

business relationship with FedEx.  *Id.* ¶¶ 16(g), 17(g).

Later in 2001, the Johnsons met with FedEx representatives to discuss providing

delivery services in Brooklyn.  *Id.* ¶¶ 16(h), 17(c).  The Johnsons agreed to provide such services

on behalf of FedEx and, in October 2001, Margaret signed the FedEx Home Delivery Standard

---

[1]    FedEx Home Delivery is a division of FedEx Ground Package System, Inc.  For purposes of this
memorandum and order, I do not distinguish between these two entities.

Contractor Operating Agreement (the "Operating Agreement"). In the Operating Agreement, the Johnsons agreed to provide pick-up and delivery services for FedEx for a work area in Brooklyn, New York, consisting of the area covered by the zip code 11201.[2]

At the time the Margaret signed the Operating Agreement, the Johnsons understood that they would be independent contractors rather than FedEx employees. *Id.* ¶ 23. The Operating Agreement memorializes that intention and its terms generally reflect an independent contractor arrangement.

Under the Operating Agreement, the Johnsons were responsible for providing their own vehicle and other equipment. Operating Agreement § 1.1, ECF No. 33-1. However, FedEx had the right to determine whether their vehicle was suitable, *id.*, and it required the Johnsons to make some alterations to their van before they could use it to service FedEx. C. Johnson Dep. 45, ECF No. 33-2. At any time when the Johnsons' van was not being used to service FedEx, the Johnsons were free to use it for other commercial or personal purposes, as long as any FedEx logos or marks were removed or covered. Operating Agreement § 1.5.

The Johnsons were responsible for the van's maintenance, *id.* § 1.2, although FedEx management told Curtis when repairs should be made, *see* C. Johnson Dep. 64, 104. The Johnsons were also responsible for fuel costs, Operating Agreement § 1.3, although FedEx would increase their compensation if the price of fuel exceeded $1.25 per gallon, *id.* Addendum 3, § 1.F; *see also* C. Johnson Dep. 63–64. The Johnsons could purchase other needed tools and equipment from FedEx as part of a "Business Support Package." Operating Agreement § 7, Addendum 6. This package included decals, a uniform, a scanner and other items. *Id.* The

---

[2] Margaret rather than Curtis signed the contract because Curtis did not have a driver's license. FedEx 56.1 Stmt. ¶¶ 16(j), 17(f). For purposes of this motion, however, I deem the Operating Agreement as having been between FedEx and the Johnsons collectively.

Johnsons were not required to purchase the Business Support Package, but they chose to do so. *See id.*

The Operating Agreement expressly bars FedEx from controlling the "manner" and "means" by which the Johnsons fulfilled their responsibilities to pick-up and deliver packages within their work area. *Id.* § 1.14 ("[The Johnsons] shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results specified above, and no officer, agent or employee of [FedEx] shall have the authority to direct [the Johnsons] as to the manner or means employed to achieve such objectives and results."). Rather than FedEx, the Johnsons themselves were contractually responsible for "determin[ing] the methods, manner and means of performing the obligations specified in th[e Operating] Agreement." *Id.* § 1.4. FedEx provided some initial training to the Johnsons regarding its "service quality procedures," *id.* § 1.13, but nothing indicates the Johnsons were required to follow these procedures.

The Operating Agreement did set some parameters for the Johnsons' work. For instance, they were required to provide pickup and delivery of all packages in their work area on days and times compatible with customers' schedules. *Id.* § 1.10(a). They might also be asked to service other work areas. *Id.* They were also required to make reasonable efforts to increase FedEx's customer base and package volume; handle and transport packages so as to avoid theft, loss or damage; help achieve FedEx's goals of efficiency; foster FedEx's "professional image and good reputation"; follow applicable law; operate their van safely; and conduct their business "with integrity and honesty, in a professional manner, and with proper decorum at all times." *Id.* § 1.10(b)–(h). All drivers were required to wear a FedEx uniform and to keep their personal appearance "consistent with reasonable standards of good order as maintained by competitors

4

and promulgated from time to time by [FedEx]." *Id.* § 1.12.  Delivery vehicles also had to be

kept "in a clean and presentable fashion . . . in accordance with the standards of the industry."

*Id.*  FedEx managers were entitled to ride along with the drivers up to four times annually to

monitor their performance.  *Id.* § 1.13.

    Neither of the Johnsons ever delivered or picked up packages themselves.

Instead, they hired drivers to do so, as was permissible under the Operating Agreement.  *Id.*

§ 2.2.  Over the course of their relationship with FedEx, the Johnsons employed nine drivers.

FedEx 56.1 Stmt. ¶ 25.  These drivers were considered the Johnsons' employees, not FedEx's.

*See* Operating Agreement § 2.2.  The Johnsons were responsible for paying for their drivers'

training, *id.*, although FedEx provided the actual training content, C. Johnson Dep. 122.  The

Johnsons had discretion in hiring drivers, subject to the requirement that the drivers were

qualified under applicable law as well as FedEx's safety standards.  Operating Agreement § 2.2.

The Johnsons, not FedEx, paid the drivers they hired.  *See id.* § 2.2(b).

    The Johnsons decided whether to hire additional help on a particular day to

handle the volume for their work area.  C. Johnson Dep. 90–91.  However, sometimes a FedEx

manager would tell Curtis he needed to do so.  *See id.*

    The Johnsons were paid for their work on a weekly basis.  *See* Operating

Agreement §§ 4.1–4.2  Their pay was determined pursuant to a formula that took into account

the number of packages handled and stops made, the number of days worked, and a subsidy in

the event they were given a low-density work area.  *Id.* § 4.1.  They were also eligible for

bonuses tied to their length of service and performance.  *See id.* Addendum 3 § IV, Addendum 8.

The Johnsons received a statement of their income from FedEx on a 1099 form and "filed taxes

as self-employed truck drivers while performing services" for FedEx.  FedEx 56.1 Stmt. ¶ 24 (internal quotation marks and citation omitted).

FedEx could alter the Johnsons' work area on five work days' written notice. Operating Agreement § 6.2.  However, FedEx recognized that the Johnsons had a proprietary interest in their work area.  *See id.* § 6.3.  Thus, in the event the Johnsons' reconfigured work area resulted in a reduction in their work volume, they would be entitled to compensation from either FedEx or other drivers who had taken on the Johnsons' former customers.  *See id.* §§ 6.3–6.4.

The Operating Agreement was for an initial two-year term, which would automatically renew for successive one-year terms absent 30-days' prior notice of non-renewal from either party.  *Id.* §§ 8.1–8.2.  FedEx could terminate the contract only if (a) the Johnsons' consented; (b) FedEx ceased or scaled back its operations in the area; or (c) the Johnsons breached the contract.  *See id.* § 9.1.  The Johnsons also had the right to assign their contract to anyone "acceptable to [FedEx] as being qualified to provide the services of [the Johnsons] under th[e Operating] Agreement."  *Id.* § 15.

In 2004, the relationship between FedEx and the Johnsons began to deteriorate. On September 24, 2004, FedEx notified the Johnsons that their work area was being changed from the 11201 zip code to the 11205 zip code.  FedEx 56.1 Stmt. ¶ 19.  The stated reason for this change was that the Johnsons were providing an insufficient level of service.  *Id.*  On November 3, 2004, FedEx notified the Johnsons that they had failed to meet FedEx's safety standards and, as a result, FedEx's indemnity coverage for the Johnsons' drivers would be terminated within 30 days unless the Johnsons submitted proof of insurance.  *Id.* ¶ 22.  After the

Johnsons failed to provide proof of insurance, FedEx terminated the Operating Agreement on December 14, 2004.  *See id.* ¶ 20.

B.      *Procedural Background*

        1.      *Removal and Transfer*

        The Johnsons commenced this action in the Supreme Court of the State of New York, Kings County on October 12, 2004.  The Johnsons asserted nine causes of action, many of which relate to specific incidents over the course of their relationship with FedEx.  In their eighth cause of action, they claim that FedEx discriminates against its delivery workers on the basis of race in violation of unspecified federal and state law.  The latter claim was brought on behalf of a class consisting of FedEx's current and former minority contractors.

        FedEx removed the case to this Court, relying for subject matter jurisdiction on both diversity of citizenship and the federal question raised by the Johnsons' claims.  On January 21, 2005, FedEx moved before the United States Judicial Panel for Multidistrict Litigation (the "JPMDL") for a transfer of this action and several others to a single district court for coordinated pretrial proceedings.  Although the JPMDL initially denied that motion, on August 10, 2005, it ordered that this action and others be transferred to the United States District Court for the Northern District of Indiana.  All of the actions transferred to that court involved claims against FedEx that turned on the issue of whether delivery personnel such as the Johnsons were independent contractors or FedEx employees.

        2.      *Multidistrict Proceedings*

        The multidistrict litigation was assigned to Judge Robert L. Miller, Jr.  After extensive coordinated discovery, Judge Miller resolved numerous summary judgment motions that disposed of many of the individual actions.  First, Judge Miller held that FedEx drivers were

independent contractors as a matter of Kansas law.  *See In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 734 F. Supp. 2d 557, 559–60 (N.D. Ind. 2010) ("*FedEx I*").  A few months later, applying much of his reasoning and analysis from *FedEx I*, Judge Miller granted summary judgment in FedEx's favor in a number of the remaining cases, which involved claims under various states' laws.  *See In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 758 F. Supp. 2d 638, 653–55 (N.D. Ind. 2010) ("*FedEx II*").

Among the cases resolved in *FedEx II* was a putative class action, captioned *Louzau v. FedEx Ground Package System, Inc.*, No. 3:05-cv-538, alleging that FedEx had violated provisions of New York's Labor Law governing wages.  Judge Miller granted FedEx's summary judgment motion, holding that FedEx drivers were independent contractors as a matter of New York law, based on the record before him.  *See FedEx II*, 758 F. Supp. 2d at 703–06.  The Johnsons were not members of the *Louzau* class.  *See id.* at 706.

FedEx had also moved for partial summary judgment in the Johnsons' case.  Judge Miller denied that motion as premature, given the procedural posture of the cases before him.  *See id.*  In resolving summary judgment motions, he had considered only "evidence common to the drivers' relationships with FedEx on a nationwide basis:  the Operating Agreement and generally applicable Policies and Procedures."  *Id.* at 655.  He deemed that "FedEx managers might exercise more control than what is retained in the Operating Agreement and commonly applicable policies and procedures," but concluded that he was procedurally constrained from considering FedEx's actual control.  *Id.* at 656 (quoting *FedEx I*, 734 F. Supp. 2d at 560) (internal quotation marks omitted).

Judge Miller concluded that this constraint need not apply to the Johnsons' claims:  "Because the Johnsons aren't members of the *Louzau* class, the procedural posture of

their case is distinct, particularly regarding the scope of evidence available to the court, and nothing justifies keeping their case in this centralized docket any longer."  *Id.* at 706.  He further noted that it was for this Court to "decide how much weight to give today's decision in *Louzau* to the Johnsons' claims in light of the differing procedural and evidentiary postures of the two New York cases."  *Id.*

           3.       *Proceedings on Remand to this Court*

       Approximately six years after it was transferred, this action was remanded back to this Court.  FedEx promptly sought to renew its motion for partial summary judgment on the ground that the Johnsons were not its employees.  On August 10, 2011, the Court issued a revised briefing schedule for FedEx's motion for partial summary judgment.  Pursuant to that schedule, the Johnsons' opposition papers were due on or before September 9, 2011.  Although FedEx timely filed its moving papers, the Johnsons did not file any opposition on or before September 9, 2011.  On September 23, 2011, the Court issued an order to the Johnsons to show cause why FedEx's motion should not be granted as unopposed.  In response, the Johnsons submitted a seven-page affirmation from their attorney opposing summary judgment.  They did not submit any affidavits from persons with personal knowledge of the facts at issue nor did they submit a counter-statement of material facts pursuant to Local Civil Rule 56.1(b).

DISCUSSION

A.     *Standard of Review*

       Summary judgment is appropriate only when it is clear that "there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Wells Fargo Bank, N.A. v. ESM Fund I, LP*, 785 F. Supp. 2d 188, 192

(S.D.N.Y. 2011). "[A] fact is material if it might affect the outcome of the suit under the governing law." *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010) (internal quotation marks and citations omitted) (alteration in original). "A fact [dispute] is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks and citations omitted). In making the determination as to whether summary judgment is appropriate, the evidence must be construed in the light most favorable to the nonmoving party. *Id.*

The moving party bears the initial burden of demonstrating its entitlement to summary judgment. *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Even if no opposition is presented, summary judgment must be denied unless this initial burden is satisfied. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Once it has been satisfied, however, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin*, 467 F.3d at 273 (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)); *see also F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273 (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

B.      *The Evidentiary Record for Purposes of This Motion*

In considering this motion for summary judgment, I am limited to the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" filed by the parties. Fed. R. Civ. P.

56(c)(1)(A). If a party fails to cite support in the record for its factual assertions, or fails to address another party's assertion of fact, a court may "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Id.* 56(e)(2)–(3). Although a court need only consider the record materials cited by the parties, it may consider anything in the record, even if uncited. *Id.* 56(c)(3).

Here, the Johnsons have not submitted or cited any record evidence opposing summary judgment. Their opposition consists solely of their attorney's affirmation, which contains factual assertions but does not cite to any affidavits, deposition transcripts or other documents in the record. Their attorney does not purport to have personal knowledge of the nature of the Johnsons' relationship with FedEx. Therefore, I will not consider the unsupported factual assertions in his affirmation. *See id.* 56(c)(4) (affidavits submitted in connection with summary judgment motions must, among other things, "be made on personal knowledge"); *Randell v. United States*, 64 F.3d 101, 109 (2d Cir. 1995) (unsupported assertions by counsel are "inadequate to defeat a motion for summary judgment").

This Court's Local Civil Rule 56.1 further governs summary judgment procedures. That rule requires the movant to submit a statement of "the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a). The party opposing summary judgment must submit a counterstatement responding to each of the assertions in the movant's statement. *Id.* 56.1(b). The failure to submit such a counterstatement results in the facts in the movant's statement being "deemed to be admitted for purposes of the motion." *Id.* 56.1(c); *see also T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56. 1 statement permits the

court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied*, 130 S. Ct. 3277 (2010); *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998) ("We accept as true the material facts contained in defendants' Local Rule [56.1] statement because plaintiff failed to file a response."). Of course, a court should not accept even uncontroverted facts in a Rule 56.1 statement unless they are properly supported by record citations. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 72–74 (2d Cir. 2001).

Having reviewed FedEx's Rule 56.1 statement, I have determined that the facts stated therein are properly supported by citations to deposition testimony and other record evidence. Since the Johnsons have not submitted a counterstatement, I deem all of the facts in FedEx's Rule 56.1 statement to be admitted.

In sum, given the absence of any properly supported evidentiary submissions by the Johnsons, I am limited to the record created by FedEx. That record consists of the facts in FedEx's Rule 56.1 statement, the Operating Agreement, excerpts from the transcripts of the Johnsons' depositions and a few other documentary exhibits concerning Trin Star and FedEx's termination of its relationship with the Johnsons. My determination as to whether there is any genuine dispute as to whether the Johnsons were independent contractors is limited to those materials.

C.     *The Significance of the* FedEx II *Decision*

FedEx argues that Judge Miller's decision regarding the *Louzau* class in *FedEx II* "should be given significant weight in this case." FedEx Mem. of Law 10, ECF No. 32-1. FedEx does not argue that the rulings in *FedEx II* are controlling under doctrines such as the law of the case or collateral estoppel. *Louzau* was a separate civil action in which the Johnsons were not parties, and those doctrines therefore do not apply. *Cf. Deutsch v. Novartis Pharms. Corp.*,

768 F. Supp. 2d 420, 428 (E.D.N.Y. 2011) (noting that the law of the case applies to a transferee

court's rulings in the *same* case after that case is remanded to the transferor court). Indeed,

Judge Miller left it to this Court to rule on FedEx's summary judgment motion in this case for

the very reason that he recognized a different result might be appropriate than the one in *Louzau*.

*See FedEx II*, 758 F. Supp. 2d at 706.

      I have considered Judge Miller's rulings for what they are – the reasoned and

thoughtful decision of a court of coordinate jurisdiction facing virtually identical factual and

legal issues. I do not, however, give them any deference beyond the extent to which I agree with

them based on the evidence and arguments before me.

D.    *The Governing Legal Standard on the Issue of the Johnsons' Employment Status*

      FedEx seeks partial summary judgment on the sole ground that the Johnsons were

independent contractors. The Johnsons do not dispute that independent contractors cannot assert

employment-discrimination claims under either Title VII or the NYSHRL. *See Eisenberg v.

Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000) ("Title VII and the

[NYSHRL] cover 'employees,' not independent contractors."). Thus, the sole question for

purposes of this motion is whether the Johnsons were FedEx employees or independent

contractors.

      There is a dispute between the parties as to the appropriate legal standard for

answering this question. FedEx invokes the standard adopted by the Second Circuit in *Eisenberg*

for determining employee status for purposes of both Title VII and NYSHRL. *See Eisenberg*,

237 F.3d at 113–14. This standard consists of 13 non-exhaustive factors "culled from the federal

common law of agency" by the Supreme Court in *Community for Creative Non-Violence v. Reid*,

490 U.S. 730 (1989). The 13 *Reid* factors are:

> "[1] the hiring party's right to control the manner and means by
> which the product is accomplished . . . [;][2] the skill required; [3]
> the source of the instrumentalities and tools; [4] the location of the
> work; [5] the duration of the relationship between the parties; [6]
> whether the hiring party has the right to assign additional projects
> to the hired party; [7] the extent of the hired party's discretion over
> when and how long to work; [8] the method of payment; [9] the
> hired party's role in hiring and paying assistants; [10] whether the
> work is part of the regular business of the hiring party;
> [11] whether the hiring party is in business; [12] the provision of
> employee benefits; and [13] the tax treatment of the hired party."

*Eisenberg*, 237 F.3d at 114 (quoting *Reid*, 490 U.S. at 751–52) (alterations in original).

The Johnsons do not cite or discuss the *Eisenberg* standard. Instead, they rely on the standard enunciated by the New York Court of Appeals in cases such as *Bynog v. Cipriani Group, Inc.*, 802 N.E.2d 1090 (N.Y. 2003). The issue in *Bynog* was whether a group of waiters were employees within the meaning of New York's Labor Law, which regulates employers' payment of wages and benefits. *See id.* at 1091. The Court of Appeals explained "that the critical inquiry in determining whether an employment relationship exists pertains to the *degree of control exercised by the purported employer over the results produced or the means used to achieve the results*." *Id.* at 1092–93 (emphasis added). It identified five non-exhaustive factors that should be considered in assessing the degree of control: "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id.* at 1093. The Court of Appeals has applied this standard in determining whether someone is an employee for purposes of the NYSHRL. *See Scott v. Mass. Mut. Life Ins. Co.*, 657 N.E.2d 769, 771 (N.Y. 1995).

At the outset, I conclude that the Johnsons have abandoned any Title VII claim. For purposes of Title VII, whether a claimant is an employee is "to be determined under the common law of agency, *rather than individual state law*." *Salamon v. Our Lady of Victory*

*Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)) (emphasis added). The Johnsons' opposition fails to refer to the federal common law governing the issue of employment status in the Title VII context or to Title VII at all. The Johnsons' sole argument is that they "are not independent contractors *under New York law*." Tanenbaum Aff. ¶ 7, ECF No. 35 (emphasis added) (capitalization removed). FedEx has clearly argued in its moving papers that the Johnsons are independent contractors under both federal and state law. By failing to respond at all to FedEx's federal law arguments, the Johnsons have abandoned any federal law claims. *See, e.g.*, *Serdans v. Presbyterian Hosp. in N.Y.*, No. 09-cv-1304 (PGG), 2011 WL 4443956, at *6 (S.D.N.Y. Sept. 26, 2011) (granting summary judgment to defendants on claims due to the plaintiff's failure to address arguments regarding those claims); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

As to the Johnsons' NYSHRL claim, I conclude that there is no real conflict between the standards enunciated by the Second Circuit and the New York Court of Appeals. Both courts drew from the common law of agency and acknowledged that they were not constructing an exhaustive list of the pertinent factors. The Second Circuit expressly acknowledged that "[o]ther relevant factors may also be considered, so long as they are drawn from the common law of agency that *Reid* seeks to synthesize." *Eisenberg*, 237 F.3d at 114 n.1 (citation omitted). Similarly, the New York Court of Appeals has emphasized that the right of control is not the only relevant inquiry, and New York courts routinely consider other factors. *See, e.g.*, *Scott*, 657 N.E.2d at 771 (considering contractual agreement that the plaintiff would

operate as an independent contractor and her treatment for income tax purposes as relevant

factors); *Hernandez v. Chefs Diet Delivery, LLC*, 915 N.Y.S.2d 623, 626 (App. Div. 2011)

(recognizing that treatment for tax purposes "is certainly a significant consideration" (internal

quotation marks and citation omitted)); *see also In re Villa Maria Inst. of Music v. Ross*, 426

N.E.2d 466, 467 (N.Y. 1981) ("*All aspects of the arrangement must be examined* to determine

whether the degree of control and direction reserved to the employer establishes an employment

relationship." (emphasis added)); *FedEx II*, 758 F. Supp. 2d at 705 ("Although the *Bynog* court

clarified that the employment test involved five factors, most New York cases seem to take a

totality of the circumstances approach to determining whether the right to control exists.").

Although the New York Court of Appeals has never articulated a comprehensive list of factors as

the Supreme Court did in *Reid*, there is no reason to think that it would reject any of the *Reid*

factors.

In addition, despite their different formulations and factors, an identical inquiry

follows from either standard. Both tests place primary importance on the purported employer's

control over the worker. *See Eisenberg*, 237 F.3d at 114; *Bynog*, 802 N.E.2d at 1092–93.

Furthermore, the factors that the *Bynog* court listed as being relevant to the issue of control are

essentially covered by the various *Reid* factors. Thus, while *Reid* considers control as the chief

among many factors, *Bynog* treats those other factors as bearing on the ultimate question of

control. It is difficult to imagine these two approaches leading to different outcomes in the same

case.

There is at least one potential difference between the tests articulated by the

Second Circuit and the New York Court of Appeals. The *Bynog* court referred to the "control

exercised by the purported employer *over the results produced or* the means used to achieve the

results," 802 N.E.2d at 1093 (emphasis added), while *Reid* refers to the "right to control the manner and means by which the product is accomplished," 490 U.S. at 751. This textual distinction might suggest that, under New York law, control over results produced is sufficient to create an employer-employee relationship even if the employer had no control over the manner and means used to achieve that result.

As Judge Miller explained in the multidistrict proceedings, however, the disjunctive formulation used by the New York Court of Appeals does not suggest that the New York standard is significantly different from formulations such as the one in *Reid*. *See FedEx II*, 758 F. Supp. 2d at 703–05. Although a finding of the requisite control

> may rest upon evidence that the employer exercises either control over the results produced or over the means used to achieve the results, *control over the means is the more important factor to be considered*. Thus, *incidental control over the results produced without further indicia of control over the means employed to achieve the results will not constitute substantial evidence of an employer-employee relationship*.

*In re Ted is Back Corp.*, 475 N.E.2d 113, 114 (N.Y. 1984) (emphasis added) (citations omitted). I agree with Judge Miller's analysis on this point and, at least in general, with his conclusion that "[c]ontrol over results is 'incidental' if there is no control over the means used to achieve those results." *FedEx II*, 758 F. Supp. 2d at 705.

Accordingly, I will consider all of the *Reid* factors, recognizing that the primary question is whether FedEx exercised the requisite control over the Johnsons. Since many of the other factors bear on the issue of control, I will address it after the other factors.

E.    *Analysis of Pertinent Factors*

  1.    *Irrelevant and Indeterminate Factors*

        Not all of the *Reid* factors will necessarily be considered in each case:

        [A] court must disregard those factors that, in light of the facts of a
        particular case, are (1) irrelevant or (2) of "indeterminate" weight – that
        is, those factors that are essentially in equipoise and thus do not
        meaningfully cut in favor of either the conclusion that the worker is an
        employee or the conclusion that he or she is an independent contractor.

*Eisenberg*, 237 F.3d at 114.

        I conclude that the location of the work is irrelevant in this case. The very nature

of delivery work requires deliverers to travel from a centralized pick-up location to an array of

remote drop-off locations. It is the nature of the work rather than the status of the workers as

employees or independent contractors that dictates where this work will take place.

Accordingly, the location of the Johnsons' work does not bear on their employment status and I

will disregard this factor.

        The method of payment is indeterminate. It is undisputed that the Johnsons'

payment was based on the combination of a daily rate, a per-package rate and a location-based

rate. However, there is nothing in the record indicating what portion of their total compensation

was a daily wage – indicative of employee status – and what portion was based on their

completion of specific tasks – indicative of independent contractor status. *See JustMed, Inc. v.

Byce*, 600 F.3d 1118, 1127 (9th Cir. 2010) ("independent contractors are often paid upon

completion of a specific job" while receipt of a regular salary tends to show that a worker is an

employee); *Eisenberg*, 237 F.3d at 119 ("Compensation primarily or exclusively on the basis of

time worked . . . suggests that a worker is an employee."). Since there is no indication as to

whether the Johnsons were paid more like employees or more like independent contractors, I

conclude that this factor is indeterminate.

2.      *Factors That Weigh in Favor of Employee Status*

a.      *The "In Business" and "Regular Business" Factors*

FedEx understandably concedes that it is both in business and that the Johnsons'
work was part of its regular business.  Indeed, the Johnsons' work was to provide the services
that are central to FedEx's entire business – picking up and delivering packages.  Thus, these two
factors unequivocally weigh in favor of characterizing the Johnsons as employees.

b.      *The Duration of the Relationship*

The duration of the relationship also weighs in favor of that result.  FedEx argues
that contracts "for fixed terms, albeit with a possibility of renewal, are indicative of independent
contractor status."  FedEx Mem. of Law at 21 (citing *DeSouza v. EGL Eagle Global Logistics
LP*, 596 F. Supp. 2d 456, 465 (D. Conn. 2009); *Clesi v. Zinc Corp.*, No. 5:01-CV-374, 2001 WL
1223456, at *4 (N.D.N.Y Oct. 11, 2001)).

I disagree.  The Operating Agreement was for a fixed two-year term but would
renew automatically for successive one-year terms absent notice of non-renewal.  This
arrangement suggests the Johnsons and FedEx intended to enter into "a permanent working
arrangement . . . under which [the Johnsons could] continue as long as their performance [was]
satisfactory."  *N.L.R.B. v. United Ins. Co. of Am.*, 390 U.S. 254, 259 (1968).  This is suggestive
of an employer-employee relationship.  Moreover, even if the Johnsons' relationship with FedEx
"was intended to be for a fixed period of time, [it] was not for such a short duration as to indicate
that [the Johnsons were] not . . . employee[s]."  *Rohn Padmore, Inc. v. LC Play Inc.*, 679
F. Supp. 2d 454, 467 (S.D.N.Y. 2010).  Therefore, viewing the evidence in the light most
favorable to the Johnsons, I conclude that this factor weighs in their favor.

c.      *The Skill Required*

I conclude that the skill required also favors the Johnsons.  An independent contractor is more likely to be highly-skilled than unskilled.  *See Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998) (fact that defendant was "a skilled computer programmer" weighed in favor of his independent contractor status).  FedEx suggests that the Johnsons had to exercise their skills of hiring, training and supervising their employee-drivers.  On the other hand, there is no evidence that FedEx actually hired the Johnsons or its other drivers because it believed they were highly skilled managers.  Presumably, the only skills truly "required" for the work the Johnsons did are the ability to drive a van and carry packages.  Again viewing the evidence in the light most favorable to the Johnsons, I conclude this factor weighs in their favor.

3.      *Factors That Weigh in Favor of Independent Contractor Status*

a.      *Employee Benefits*

The Johnsons concede that the employee benefits factor weighs in favor of characterizing their status as independent contractors.  Tanenbaum Aff. ¶ 16.  In light of that concession and the absence of any record evidence to the contrary,[3] I conclude this factor weighs in FedEx's favor.

b.      *The Source of Instrumentalities and Tools*

The source of the instrumentalities and tools also weighs in favor of independent contractor status.  The Johnsons acquired the van they used to deliver packages for FedEx before they entered into the Operating Agreement and they retained exclusive ownership of the van throughout their time with FedEx.  *See* Operating Agreement § 1.1.  They were responsible for all maintenance and repairs.  *Id.* §§ 1.2–1.3.  The Johnsons did obtain a Business Support

---

[3]      The court in *FedEx I* stated that FedEx does offer its drivers some benefit programs, including a driver-funded retirement plan.  *See FedEx I*, 734 F. Supp. 2d at 568.  Any evidence of such benefit programs has not been presented in connection with this motion.

Package from FedEx, contained decals, a standard uniform, a drug test and other items.  *See id.*

Addendum 6.  However, the Johnsons were not required to purchase these items from FedEx,

and thus they could have obtained any needed items from their own sources.  Nothing in the

record suggests that this was not a realistic option.[4]

 In addition, the Johnsons were principally responsible for their fuel costs.  *Id.*

§ 1.3.  Although FedEx agreed to provide additional compensation to the Johnsons if the price of

fuel exceeded $1.25 per gallon, *id.* Addendum 3, § 1.F, and did in fact provide such

reimbursements, C. Johnson Dep. 60–61, 63, the Johnsons paid the bulk of these costs.

 Thus, the undisputed evidence shows that the Johnsons owned their delivery van

and paid for maintenance costs and the bulk of operating costs themselves.  I conclude that the

Johnsons owned and provided their own equipment and instrumentalities and this factor weighs

in favor of independent contractor status.

  c. *Role in Hiring and Paying Assistants*

 The Johnsons' role in hiring and paying assistants weighs strongly in favor of

their independent contractor status.  The Johnsons had broad discretion to hire drivers.  They

determined whom to hire, how many people to hire and how much to pay their employees.

 FedEx did have some control over the Johnsons' employees.  The Operating

Agreement specifies that the Johnsons' employees had to be qualified pursuant to FedEx's "Safe

Driving Program standards."  Operating Agreement § 2.2.  To be qualified under those standards,

a driver needed to, among other things, undergo a physical examination by a FedEx-approved

physician, pass a drug screening, and successfully complete both a written examination and a

road test.  Evans Aff., Ex. L, ECF No. 33-9.  Furthermore, the Safe Driving Program prescribes

---

[4] In *FedEx I*, the court was presented with evidence that 99% of FedEx drivers exercised the option of purchasing a Business Support Package from FedEx.  *See FedEx I*, 734 F. Supp. 2d at 566.  Since that evidence is not before me, I need not address its impact.

safety standards that go beyond the requirements of any applicable laws.  *See id.*  However, if one of the Johnsons' drivers violated the Safe Driving Program, FedEx could not force the Johnsons to fire that driver; rather, the result of driver's disqualification from the program "would be to require that substitute insurance covering the driver be found if he/she is to continue to render services required for [FedEx's] business."  *Id.* at 1.  In addition to the Safe Driving Program, FedEx had the right to maintain standards for the Johnsons' employees' physical appearance.  *See* Operating Agreement § 1.12.  FedEx also provided the training program for the Johnsons' employees, although the Johnsons financed that training.

Moreover, Curtis testified that a FedEx manager "[s]ometimes" told him that he needed to hire additional help on a given day.  C. Johnson Dep. 89.[5]  Thus, FedEx played a role in determining that the Johnsons had adequate staffing.  In addition, if there were problems with the Johnsons' drivers, FedEx would sometimes "bypass" the Johnsons and take issues directly to the Johnsons' drivers.  *Id.* at 99.  At other times, FedEx raised such issues with the Johnsons. *See id.*

On the whole, however, there is no genuine dispute that the Johnsons had the predominant role in hiring, paying and supervising their drivers.  The Johnsons' role in hiring and paying assistants thus weighs in favor of their independent contractor status.  Indeed, the Johnsons did more than merely hire and pay *assistants* – they hired and paid others to do all of the actual work they were obligated to perform under the Operating Agreement.  Furthermore,

---

[5] Curtis's deposition testimony is inconsistent on this point.  He testified that "[s]ometimes, [a FedEx manager]  ha[s] to tell you you have to get somebody to help."  C. Johnson Dep. 89.  He then testified that the FedEx manager "*wouldn't tell you you have to have a helper.  He said you have to get out these cargos from here.*"  *Id.* (emphasis added).  Then, when asked if the FedEx manager sometimes told Curtis he needed to hire additional help, Curtis answered "[y]es, he would tell me."  *Id.* at 90.  When asked if he alone decided that he needed a helper, Curtis answered "[n]o.  I wouldn't make that decision . . . ."  *Id.*  Curtis later testified that there were occasions when his employee would call him and ask for permission to hire additional help and Curtis would grant that permission, apparently without consulting with anyone at FedEx.  *See id.* at 91.  Given all of this testimony as a whole, and viewing the testimony in the light most favorable to Johnson, I conclude that FedEx management told Curtis he needed to hire additional help, but only sometimes.

they not only had the right to hire employees to do their work, but also to assign their entire contract to a third party. "Generally, employees can't sell their jobs, and they can't hire other people to do their jobs for them." *FedEx II*, 758 F. Supp. 2d at 659. Since the Johnsons could do both, this factor supports a conclusion of independent contractor status.

            d.      *The Right To Assign Additional Projects to the Hired Part*y

An employer generally directs an employee as to which tasks to perform, while an independent contractor is obligated only to perform whatever tasks it has agreed to by contract. *See Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86 (2d Cir. 1995); *Aymes v. Bonelli*, 980 F.2d 857, 863 (2d Cir. 1992) ("[I]ndependent contractors are typically hired only for particular projects."). Here, it is undisputed that the Johnsons were obligated only to perform delivery services. FedEx could not reassign the Johnsons to perform other tasks, such as sorting packages or clerical duties.

On the other hand, the Operating Agreements obligates the Johnsons to perform package delivery services both in their work area "*and in such other areas as [they] may from time-time be asked to service*." Operating Agreement § 1.10 (emphasis added). This is somewhat similar to a contractual provision that the Second Circuit held in *Carter* was indicative of employee status. In *Carter*, a group of artists had agreed to install a sculpture and "also to 'render such other related services and duties as may be assigned to [them] from time to time by the [defendants].'" *Carter*, 71 F.3d at 86 (first alteration in original). The Second Circuit concluded that, "[w]hile the artists' obligations were limited to related services and duties, the defendants nonetheless did have the right to assign to plaintiffs work other than the principal sculpture." *Id.* As in *Carter*, the contract here suggests that the Johnsons might be given more work, albeit of limited scope, beyond covering their assigned work area.

This case differs from *Carter* in at least three ways. First, the Operating Agreement suggests that the Johnsons might merely be "asked" to perform deliveries outside their work area, which suggests they might decline. The provision in *Carter* allowed the artists to be "assigned" additional work, which suggests that declining to perform additional work was not an option. Second, the Johnsons have submitted no evidence that they ever were asked to provide services outside their work area or, if they were, that they were obligated to agree to this request. In *Carter*, the Second Circuit noted that "the defendants did, in fact, assign such other projects" and the artists performed them. *Id.* Finally, in the event the Johnsons did take on additional deliveries outside their work area, they would have received additional compensation for doing so. In *Carter*, the artists "were assigned additional projects, which they completed *without further compensation*." *Id.* (emphasis added). Receiving extra compensation for performing extra tasks is more consistent with independent contractor status. Thus, on the present record, I conclude that this factor weighs in FedEx's favor.[6]

> e.    *Tax Treatment*

There is no dispute that the Johnsons were treated as independent contractors for tax purposes. The Johnsons received a statement of their income for tax purposes on a Form 1099, used generally for independent contractors, rather than a Form W-2, used generally for employees. *See Eisenberg*, 237 F.3d at 118; *Perfect Dental, PLLC v. Allstate Ins. Co.*, 538 F. Supp. 2d 543, 545 & n.3 (E.D.N.Y. 2007); *see also Bynog*, 802 N.E.2d at 1093. This factor weighs in favor of the Johnsons' independent contractor status.

---

[6]    Not only was FedEx limited in giving additional work to the Johnsons, it was also limited in taking away their work. If the Johnsons work area was altered, resulting in their loss of customers served, they were entitled to compensation under the Operating Agreement. *See* Operating Agreement § 6.3. That the Johnsons had a proprietary interest in their customers further suggests that they were independent contractors.

f.     *Discretion Over When and How Long To Work*

Pursuant to the Operating Agreement, "no officer, agent or employee of [FedEx] shall have the authority to prescribe hours of work [or] whether or when the Contractor is to take breaks."  Operating Agreement § 1.14.  Nothing in the record suggests that this provision was not followed.

On the other hand, the Johnsons were obligated to work on certain days and at certain times, *i.e.*, the days and times "compatible with [customers'] schedules and requirements."  *Id.* § 1.10(a).  This, however, does not suggest the Johnsons were employees.  "Even independent contractors, although 'independent' in name, are required to keep to a schedule.  The fact that an independent contractor is required to be at a job or at a facility at a certain time does not eliminate his status as an independent contractor."  *DeSouza*, 596 F. Supp. 2d at 466.

It is in the very nature of the Johnsons' work – delivering and picking up packages – that obliged them to work on certain days and at certain times.  Customers would surely not accept deliveries at all hours of the night.  Within the broad parameters necessitated by the nature of their work, the Johnsons had ample discretion over their own hours and those of their employees.  Thus, this factor weighs in FedEx's favor.

g.     *The Parties' Intent and Contractual Labels*

Although not listed among the *Reid* factors, courts may look to the parties' intent and the contractual labels they assigned to their relationship to determine whether they entered into an employer-employee relationship.  *See, e.g.*, *Scott v. Mass. Mut. Life Ins. Co.*, 657 N.E.2d 769, 771 (N.Y. 1995); *Hernandez v. Chefs Diet Delivery, LLC*, 915 N.Y.S.2d 623, 626 (App. Div. 2011).  Of course, these factors are "not dispositive."  *Hernandez*, 915 N.Y.S.2d at 626

(internal quotation marks and citation omitted); *see also Eisenberg,* 237 F.3d at 116 ("[T]he right to be treated in a non-discriminatory manner does not depend on the terms of any particular contract."); *FedEx II,* 758 F. Supp. 2d at 658 (the law governing employment status "generally require[s] courts to look beyond contractual labels"). Otherwise, employers could simply contract their way around the protections of labor laws and anti-discrimination laws by labeling their employees as "independent contractors," even though many of these statutes confer rights that are "not subject to waiver or sale." *Eisenberg,* 237 F.3d at 116.

There is no dispute that the parties intended to enter into an independent contractor arrangement and that the Johnsons were labeled as independent contractors in the Operating Agreement. Although neither of these facts is controlling, they should be considered along with the other factors.

h.      *The Right To Control*

To this point, I have disregarded two of the *Reid* factors, concluded that four factors weigh in the Johnsons' favor and that six factors weigh in FedEx's favor. In addition, the parties' intent and the labels used in the Operating Agreement provide some additional support to FedEx. While FedEx thus has a quantitative advantage, that is not dispositive. A court "do[es] not just count the factors that favor one camp, and those the other, and declare that whichever side scores the most points wins." *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 497 n.3 (D.C. Cir. 2009). The factors considered thus far do not weigh so decisively in FedEx's favor as to support a grant of summary judgment.

It is the most important factor – the right to control the manner and means of work – that leads to the conclusion that the Johnsons were independent contractors as a matter of law. Of the other *Reid* factors already considered, those that weigh in FedEx's favor are those most

indicative of control. The Johnsons provided their own equipment, could not be reassigned to other tasks, had broad discretion over their hours and could hire others to do their work.

The *Bynog* factors also indicate that the requisite control was lacking: The Johnsons largely worked at their own convenience and not on a fixed schedule; they were free to engage in other employment and to use their van for other purposes, including commercial purposes;[7] they did not receive fringe benefits and were not on FedEx's payroll for tax purposes. Thus, all of the *Bynog* factors favor FedEx. *See Bynog*, 802 N.E.2d at 1093.

The Operating Agreement expressly provides that the Johnsons, and not FedEx, would control that manner or means used in the Johnsons' work. Operating Agreement § 1.14. It only contains broad, results-oriented obligations rather than specific rules or procedures to follow. For instance, while the Operating Agreement directed the Johnsons to "[h]andle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage," Operating Agreement § 1.10(c), nothing in the record suggests that it was not for the Johnsons to determine how to achieve this result. They were to decide how to arrange packages in their van, whether to lock the van when making deliveries, with whom to leave packages, etc. Similarly, while the Johnsons were obligated "to achieve the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment," *id.* § 1.10(d), they determined the particular driving routes and precise schedules, *see id.* § 1.14.

Some of the more specific requirements FedEx imposed on the Johnsons constitute merely incidental control under New York law. *See In re Hertz Corp.*, 811 N.E.2d 5, 6 (N.Y. 2004) ("That Hertz gave claimant instruction on what to wear, what products to promote

---

[7] The Johnsons assert that "[i]t is undisputed that the drivers were not able to operate their vehicles to deliver packages for other delivery companies such as UPS and DHL." Tanenbaum Aff. ¶ 14. They provide no record support for this proposition that would contradict the terms of the Operating Agreement, which expressly allow the Johnsons to use their equipment for any purpose.

and how to make a presentation does not support the conclusion that claimant was an employee."); *In re Pavan*, 570 N.Y.S.2d 696, 698 (App. Div. 1991) (limousine drivers who were required to have a neat appearance and a clean car, to utilize a particular radio system and own a vehicle meeting certain specifications, and were expected to work during rush hours were not employees). Thus, I conclude that FedEx had only "incidental control over the results produced without further indicia of control over the means employed to achieve the results." *In re Ted is Back Corp.*, 475 N.E.2d 113, 114 (N.Y. 1984).

The situation here is similar to one in which the New York Court of Appeals held an independent contractor relationship existed as a matter of law. In *Scott*, the Court of Appeals held that an insurance agent was an independent contractor where she "was responsible for financing her own operating expenses and support staff, was paid by performance rather than a salary, did not have . . . taxes withheld from her pay, could sell competitors' products and had agreed by contract to operate as an independent contractor." 657 N.E.2d at 771. The court noted that the agent was "required to recruit and train" some of her staff according to her purported employer's guidelines, had to attend regular company meetings, and was asked to draw up a job description for her position. *Id.* It held that these facts "establish[ed], at most, that defendants exercised minimal control over plaintiff's own daily work product." *Id.* Applying New York law, the same conclusion is warranted here.

\* \* \*

Since the most important factor and most of the other factors weigh in FedEx's favor, I conclude that the Johnsons were independent contractors as a matter of law. Although I have concluded that there is insufficient evidence in the record to create a genuine dispute on this issue, that does not mean that such evidence does not exist. I note that at least one court has

found, after a full trial, that FedEx's contractors, like the Johnsons, are employees. *See Estrada v. FedEx Ground Package Sys., Inc.*, 64 Cal. Rptr. 3d 327, 330 (Ct. App. 2007). That finding was affirmed on appeal. *Id.* at 337, 348.[8] The evidence in *Estrada* showed, for instance, that any ability of drivers' to use their equipment for independent purposes "is more imagined than real," *id.* at 333 n.5; that "drivers and their trucks are subject to inspection every day . . . and if either fails inspection, the driver may be barred from service," *id.* at 333; that "FedEx discharges drivers at will," *id.* at 336; and that FedEx exercises "control over every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair," *id.* It may therefore be that evidence could show, as the trial court found in *Estrada*, that the Operating Agreement is "a brilliantly drafted contract creating the constraints of an employment relationship with [the drivers] in the guise of an independent contractor model." *Id.* at 334 (internal quotation marks omitted) (alteration in original). However, the Johnsons have not presented such evidence – or any evidence whatsoever – in this case.

CONCLUSION

For the reasons stated above, FedEx's motion for partial summary judgment is granted and the Johnsons' eighth cause of action is dismissed.

So ordered.

John Gleeson, U.S.D.J.

Dated: December 12, 2011
       Brooklyn, New York

---

[8] The trial court in *Estrada* found that only FedEx drivers who serviced a single work area (like the Johnsons) were employees; those that serviced multiple work areas were found to be independent contractors. *See Estrada*, 64 Cal. Rptr. 3d at 331 n.1. The finding with respect to drivers servicing multiple work areas was not appealed. *Id.*